UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| ROBERT GARDNER, | ) | |
| Plaintiff, | ) | |
| | ) | No. 1:11-cv-00802 |
| -v- | ) | |
| | ) | HONORABLE PAUL L. MALONEY |
| MICHIGAN STATE UNIVERSITY BOARD OF | ) | |
| TRUSTEES, and | ) | |
| LOU ANNA SIMON, | ) | |
| Defendants. | ) | |
| _____ | ) | |

**OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART DEFENDANTS'**
**MOTION TO DISMISS AND GRANTING IN PART DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

This case involves a number of claims brought *pro se* by Plaintiff Robert Gardner against

Defendants Michigan State University Board of Trustees ("MSU") and Lou Anna Simon, the current

president of Michigan State University, for actions they have allegedly taken to deprive Mr. Gardner

of his civil rights and retaliate against him for a prior discrimination claim. Before the court today

are a motion to dismiss (ECF No. 35) and a motion for summary judgment (ECF No. 38) filed by

Defendants.

Having reviewed the motion, response, and relevant legal authority, the Court finds the

matter can be resolved without oral argument. *See* W.D. Mich. L. Civ. R. 7.2(d). For the reasons

discussed herein, the court will grant each motion in part and dismiss each of Mr. Gardner's

remaining claims.

I.    **LEGAL FRAMEWORK**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of

the plaintiff's complaint. Though a plaintiff need only plead "a short and plain statement of the

claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), the complaint must include "more than labels[,] conclusions, and a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The plaintiff must plead "sufficient factual matter" that, if accepted as true, would "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 557). "A claim is plausible on its face if the 'plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 369 (6th Cir. 2011) (quoting *Twombly*, 550 U.S. at 556). In reviewing such a motion, the court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 992 (6th Cir. 2009) (quoting *Jones v. City of Cincinnati*, 521 F.3d 555, 559 (6th Cir. 2008)). The court need not accept plaintiff's legal conclusions, however. *Ctr. for Bio-Ethical Reform*, 648 F.3d at 369.

A Rule 12(b)(6) motion to dismiss is based on the pleadings themselves, and a court is generally confined to those pleadings in deciding the motion. But "documents attached to the pleadings become part of the pleadings and may be considered on a motion to dismiss." *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 335 (6th Cir. 2007) (citing Fed. R. Civ. P. 10(c)). "In addition, when a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment." *Id.* at 335–36 (citing *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999)). And "[a] court may also consider matters of public record in deciding a motion to dismiss without converting the motion to one for summary judgment." *Id.* at 336 (citing *Lynch v. Leis*, 382 F.3d 642,

2

648 n.5 (6th Cir. 2004)).

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories and admissions, together with the affidavits, show there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Tucker v. Tennessee*, 539 F.3d 526, 531 (6th Cir. 2008).  The burden is on the moving party to show that no genuine issue of material fact exists, but that burden may be discharged by pointing out the absence of evidence to support the nonmoving party's case.  *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  The facts, and the inferences drawn from them, must be viewed in the light most favorable to the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  Once the moving party has carried its burden, the nonmoving party must set forth specific facts in the record showing there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586.  The question is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

## II.  BACKGROUND

### A.  Prior History

In 1993, early in his Ph.D. program at MSU, Plaintiff Robert Gardner filed a civil rights complaint against the school and/or its staff.  In 1997, he filed another civil rights complaint.  On August 2, 2011, Mr. Gardner filed this suit, alleging that in the nearly twenty years since those

lawsuits, Defendants[1] have repeatedly retaliated against him.  The original complaint, filed on this court's *pro se* Civil Rights Complaint Form, contained little more than a claim that "[p]otential employers at MSU were ordered not to hire [Plaintiff] or pursue funding [for his employment] because of [his] previously filed Civil Rights complaints."  (ECF No. 1.)  Mr. Gardner further claimed, without specifics, that Defendants had also interfered with his doctoral education and with potential employment unaffiliated with MSU.

Defendants Michigan State University—later replaced by the Michigan State University Board of Trustees ("MSU")—and Lou Anna Simon, president of the University, moved for a more definite statement (ECF No. 7), and Magistrate Judge Scoville granted their motion.  (ECF No. 16.) After Mr. Gardner filed his Amended Complaint, Defendants filed a motion to dismiss.  This court granted the motion in part and denied it in part, ordering Mr. Gardner to amend his complaint once more to include further details regarding his claims.  (ECF No. 30.)

### B.    Second Amended Complaint

Mr. Gardner filed this second amended complaint on February 27, 2012.  (ECF No. 31.) This complaint is far from a model of clarity.  Certain factual allegations are repeated in different contexts as apparent support for separate claims, and other factual allegations appear to have been forgotten after they were written down and are never discussed in any detail.  For these reasons, the

---

[1] As in his prior pleadings, Plaintiff's second amended complaint here—and largely throughout—refers only to "Defendant" in the singular.  These allegations are, arguably, ambiguous as to which defendant Mr. Gardner intends to accuse, but it appears from the Amended Complaint that Mr. Gardner's use of the singular is often meant to refer to both defendants.  (*See* Second Am. Compl., ECF No. 31 (caption, referring to "Michigan State University Board of Trustees and Lou Anna Simon, Jointly[,] *Defendant*" (emphasis added)).) Therefore, the court will read Mr. Gardner's singular to refer to both defendants except when context clearly suggests otherwise.

court will not now attempt to describe Mr. Gardner's claims in full, but rather will outline his pleadings. Specific allegations will be discussed more fully where they become relevant to the parties' legal arguments.

The events that are the subject matter of this suit begin in late 2007. In November of that year, Mr. Gardner alleges, a Dr. Kaminsky allegedly "agree[d] to help Plaintiff complete his Ph.D. and to hire him should funding be found." (ECF No. 31, at 6.) In early 2008, however, Dr. Kaminsky withdrew support, "stating [that] she has been told Plaintiff is not associated with MSU." (*Id.*) Through 2008, various other professors allegedly support Mr. Gardner by sponsoring IRB approval of his research projects. Mr. Gardner claims that he was "charged with organizing meetings and developing related research," during which he was "provided with travel and meals" with the "intention [of] provid[ing] employment opportunities and completion of [his] doctorate." (*Id.* at 7.) That summer, Mr. Gardner claims he was offered a $40,000 grant, which fell through after MSU's General Counsel informed the others working on the project that Mr. Gardner was not associated with MSU. (*Id.* at 7–8.) Through 2009, Mr. Gardner alleges that he approached several different MSU professors about working together, but each attempt fell through under what Mr. Gardner describes as ominous circumstances. (*Id.* at 8–11.)

Mr. Gardner also describes several interactions with outside entities where, he argues, Defendants have "thwarted" his employment efforts. One potential project with the Michigan Department of Agriculture failed due to funding being "administratively upended" and Department officials being told that Mr. Gardner is not affiliated with MSU. (*Id.* at 12–14.) Mr. Gardner also alleges that various unidentified MSU administrators worked to discredit Mr. Gardner and to

encourage others to withdraw their support of him and his projects.  (*Id.* at 14–15.)  Finally, Mr. Gardner alleges that MSU pressured an academic journal to "reject[] Plaintiff's article prematurely," and that MSU recently questioned a scholarship that Mr. Gardner's daughter's high school had given her to attend MSU classes, after which the school rescinded the scholarship for Mr. Gardner's daughter, then for all other students.  (*Id.* at 16.)

Mr. Gardner alleges several causes of action.  Count I claims retaliation claim under Title VII, and Count II claims retaliation under Michigan's Elliott Larsen Civil Rights Act.  Count III has already been dismissed.  Count IV claims a conspiracy under 42 U.S.C. § 1985 to deprive Mr. Gardner of his constitutional rights.  Count V claims tortious interference with contract, and Count VI alleges "retaliatory harassment."  (*Id.* at 17–22.)

### C.    Defendants' Motions to Dismiss and for Summary Judgment

Shortly after Mr. Gardner filed his second amended complaint, Defendants moved to dismiss it.  (ECF No. 35.)  Four days later, on March 12, 2012, Defendants filed a separate motion for summary judgment.  (ECF No. 38.)  Mr. Gardner responded to both motions (ECF Nos. 45, 51), and the time for filing a reply brief has expired without further briefing from Defendants.

The materials presented with the parties' briefs focus on a subset of the claims in Mr. Gardner's second amended complaint.  Based on the parties' briefs, four separate incidents now appear to be at issue.  The first such matter involves MSU's Dr. Larry Olsen, who Mr. Gardner alleges agreed to hire him in early 2009.  Defendants submit an affidavit from Dr. Olsen disputing this point and claiming instead that he had only "informed Robert Gardner of steps that he needed to take as a prelude to [MSU's Extension School] approving his proposed study."  (Def.'s Ex. 14, ECF No. 41-3, at 2.)  In an attached email message, Dr. Olsen describes several policy requirements

6

that MSU requires its employees to follow, even for "research or surveys being conducted by other parties." (*Id.* at 7.) For his part, Mr. Gardner presents a series of emails regarding this opportunity, along with what he claims is a transcript of a contemporaneous voicemail message left by Dr. Olsen. (Pl.'s Ex. 8, ECF No. 52-8.) In it, Dr. Olsen notes that he was "challenged" after mentioning Mr. Gardner's proposed project to "Steve," and he attempted to explain the same MSU policy as in the above email. According to Dr. Olsen, Mr. Gardner could not move forward on his proposal until the university approved it. (*Id.*)

Mr. Gardner also presents documentary evidence regarding his attempts to work with MSU's Dr. Michelle Kaminski[2] on a research project in 2007 and 2008. (*See* Pl.'s Ex. 4, ECF No. 52-4.) According to these documents, the project received IRB approval (*id.* at 6), and Dr. Kaminski showed "initial interest" in it. But the project appears to have faltered when Steve Lovejoy declined "MSUE staff assistance in carrying out [Mr. Gardner's] research project":

> I have talked to Professor Kaminski who informed me that she was under the impression that you were an active graduate student at MSU in the Dept. of Agricultural Economics. In checking with the Department of Agricultural Economics, that is not correct. In fact, we are unaware of any present connection to MSU. Therefore, she has decided to close out her IRB request. Without an IRB approval, your project does not meet the requirements of our policy concerning MSUE staff assistance.

(*Id.* at 8.)

Next, Mr. Gardner presents a series of emails between himself, a Dr. Groty, and Mary Bedikian, of MSU's law school, regarding a "mediation project" in which Mr. Gardner, "Don [Power] and Mary [Bedikian] were involved." (Pl.'s Ex. 5, ECF No. 52-5, at 5.) In spring 2009,

---

[2] Presumably the same person as the "Dr. Kaminsky" referenced in Mr. Gardner's complaint.

Mr. Gardner tells Ms. Bedikian that they "[n]ow have the official MSU blessing to conduct the Mediation research," and she responds to thank him for his "continued commitment to this project." (*Id.* at 2.)  Mr. Gardner then emails various persons regarding what appears to be a related symposium, with little effect.  (*Id.* at 2, 4–5.)  The fate of this project and symposium is not made clear from the evidence.

Finally, Mr. Gardner presents evidence regarding his claim that he was hired by Dr. Eduardo Guizar, a Professor of Spanish at MSU.  His documentation shows that Dr. Guizar's project received IRB approval and a $500 grant to cover the cost of two meetings.  (*See* Pl.'s Ex. 6, ECF No. 52-6.) In the only other email in this set, from ten days later, Dr. Guizar states that he "will not begin the research unless we receive a grant" and asks Mr. Gardner not to begin research without his consent. (*Id.* at 5.)

The other evidentiary dispute here involves Mr. Gardner's history of litigation against MSU, its officers, and its employees.  Defendants present evidence of Mr. Gardner's 1997 and 2002 suits against MSU, both of which were dismissed on the merits.  Mr. Gardner presents his own evidence regarding the scope and effect of these decisions, as well as materials regarding a separate incident of alleged police harassment from 1997.  (Pl.'s Exs. 2, 7, ECF Nos. 52-2, 52-7.)

## III.    DISCUSSION

Defendants' motion to dismiss argues that Mr. Gardner has failed to adequately plead any of his claimed causes of action.  Their motion for summary judgment cites to documentary evidence and signed affidavits in claiming that there is no genuine dispute of material fact that would allow

Mr. Gardner's claims to survive.[3]

The court will address Defendants' arguments against each claim in turn.

### A.    Mr. Gardner's Title-VII and Elliott–Larsen Claims

#### 1.    Motion to Dismiss

In relevant part, Title VII provides that an employer may not "discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Claims brought under Michigan's Elliott Larsen Civil Rights Act follow the same standard. *See Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004).

In their motion to dismiss, Defendants argue that Mr. Gardner has failed to allege a cognizable retaliation claim under Title VII or Michigan's Elliott Larsen Civil Rights Act (counts I and II, respectively). According to Defendants, Gardner's claim fails on two fronts: (1) he fails to allege that he was an employee or applicant for employment, and (2) he does not allege that he has opposed an unlawful practice or participated in any protected matter.

This argument fails. Mr. Gardner is a *pro se* litigant, and his pleadings should be "liberally construed." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Read in this light, Mr. Gardner's complaint sufficiently alleges that he was told he would be hired by Dr. Larry Olsen. (*See, e.g.*, ECF No. 31,

---

[3] Defendants' summary-judgment motion also begins to argue that the doctrines of claim preclusion and issue preclusion bar Mr. Gardner from raising some of the claims in his complaint. But Defendants fail to follow through on this argument. While the motion does discuss several prior lawsuits in which Mr. Gardner had raised claims against MSU and affiliated persons, it entirely fails to discuss the relevant legal standard or to apply that standard to the facts of this case. Further, in his response, Mr. Gardner avers that he has no intent to renew previous complaints. The court therefore declines to address this argument at present.

at 8 ¶ (e) ("Olsen . . . states he will hire Plaintiff").)[4]  Defendants argue that this allegation does not actually describe an employment opportunity that would fall under Title VII, but that is a question of fact, not a question of the sufficiency of Mr. Gardner's pleading.  If taken as true, Mr. Gardner has pleaded an employment relationship.  That is sufficient for now.

Similarly, Mr. Gardner's allegation that he filed two prior civil-rights suits against MSU is sufficient to avoid Rule 12(b)(6) dismissal on the "protected conduct" element.  Even if it were not, however, the court "may also consider public records, matters of which a court may take judicial notice, and letter decisions of governmental agencies" when resolving a motion to dismiss.  *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999).  These matters include the two prior lawsuits, which were indeed brought on grounds of national-origin discrimination, as Defendants' motion for summary judgment makes clear. (ECF No. 39, at 1–3 (discussing Mr. Gardner's prior suits).)  These lawsuits also negate Defendants' third claim: that Mr. Gardner failed to allege that MSU decision-makers knew of his protected activity.  This claim fails for the simple reason that the more recent of Mr. Gardner's prior suits was brought specifically against the MSU Board of Trustees and Defendant Simon.  (*See* ECF No. 39-5.)  This is enough to satisfy Mr. Gardner's pleading burden.  Defendants' motion to dismiss on these points will therefore be denied.

        2.    *Motion for Summary Judgment*

A plaintiff's retaliation claim can survive summary judgment two ways: with direct evidence of retaliation, or through the *McDonnell Douglas* burden-shifting framework. *Taylor v. Geithner*,

---

[4] Mr. Gardner also alleges that he applied for two specific positions at MSU: an Extension Agriculture and Natural Resources Agent in spring 2008, and an Animal Science Specialist Position in July 2008.  (ECF No. 31, at 6.)  These positions do not appear to be related to any other allegations, however, and it is entirely unclear from the complaint whether he claims retaliation due to his (presumably) not being hired for these jobs.

703 F.3d 328, 336 (6th Cir. 2013). Mr. Gardner has no direct evidence of retaliation, so the court must apply *McDonnell Douglas*. The first part of this framework, and the only part argued by the parties, requires the Plaintiff to establish a *prima facie* case of retaliation. This *prima facie* case has four elements: (1) Plaintiff engaged in a protected activity under Title VII; (2) the employer knew about Plaintiff's exercise of protected rights; (3) the employer took adverse employment action against the Plaintiff; and (4) there was a causal connection between the adverse employment action and the protected activity. *Id.*

In their summary-judgment motion, Defendants argue essentially the same points as before—only this time with supporting documentation. They argue first that there could have been no adverse employment action, because Mr. Gardner was not an employee or applicant for employment during the relevant time. Second, they argue that Mr. Gardner did not engage in any protected activity, and even if he had, Defendants were not aware of it.

This last argument fails for the same reasons noted above, and the court will not spend further time on it. The first argument, however, has more merit. Defendants submit an affidavit from Dr. Olsen stating that rather than hiring Mr. Gardner, he had only spoken with him about a proposed research program and then "informed Robert Gardner of steps that he needed to take as a prelude to [MSU Extension] approving his proposed study." (Def.'s Ex. 14, ECF No. 41-3, at 2.) Attached email messages between Dr. Olsen and Mr. Gardner corroborate this statement. In one, Dr. Olsen informs Mr. Gardner that MSU requires its employees to follow its policies, even for "research or surveys being conducted by other parties":

> Our employees are required to abide by established policies related to any research or surveys being conducted by other parties. Therefore, should you wish to: 1). use the T. Nichols Research and Extension Center, 2). [use] any county Extension office or, 3). work

11

> with a staff member of MSU Extension this policy would need to be
> followed.
>
> * * *
>
> It might be easier for you to complete the project not using MSU
> resources.

(*Id.* at 7.)  This letter makes clear that Dr. Olsen did not consider Mr. Gardner an employee, or even

an applicant for employment.  If he were, then he would be directly obligated to follow the MSU

policies, rather than indirectly obligated as Dr. Olsen outlines.  Instead, Mr. Gardner was an "other

party" who was not allowed to work with any MSU Extension staff unless he followed MSU

guidelines.

This conclusion fits with the legal meaning of "employee" as well.  Title VII's definition of

"employee"—"an individual employed by an employer"—is of little use here.  In such situations,

the Supreme Court has instructed the courts to look to the common law of agency relationships.

*Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992); *Bryson v. Middlefield Volunteer Fire*

*Dept., Inc.*, 656 F.3d 348 (6th Cir. 2011) (applying common law to Title VII claims).  Under the

common-law standard, the most important factor in an employment relationship is "the hiring party's

right to control the manner and means by which the product is accomplished," though the courts will

consider numerous other factors as well, including

> the skill required; the source of the instrumentalities and tools; the
> location of the work; the duration of the relationship between the
> parties; whether the hiring party has the right to assign additional
> projects to the hired party; the extent of the hired party's discretion
> over when and how long to work; the method of payment; the hired
> party's role in hiring and paying assistants; whether the work is part
> of the regular business of the hiring party; whether the hiring party is
> in business; the provision of employee benefits; and the tax treatment
> of the hired party.

*Darden*, 503 U.S. at 323–24 (quoting *Cmty. for Creative Non–Violence v. Reid*, 490 U.S. 730, 751–52 (1989)).  Mr. Gardner's evidence pushes none of these factors toward an employment relationship.  If anything, these documents show that Mr. Gardner had broad discretion over the subject matter of the proposed research project, even if he was limited in his ability to use MSU resources to accomplish it.  Similarly, the evidence fails to show that Mr. Gardner was seeking any such employment relationship.  This evidence therefore cannot support Mr Gardner's claimed employment relationship.

In his response brief, Mr. Gardner presents what he asserts is a transcript of a voicemail message left by Dr. Olsen around this time.  (Pl.'s Ex. 8, ECF No. 52-8.)  In it, Dr. Olsen states, "After [I] talked to you last night, I did confirm that we do have a policy[,] and when I mentioned . . . to Steve what you requested[,] boy, did I get . . . challenged!"  (*Id.*)  Dr. Olsen then read from a section of the same policy discussed in his email and explained that Mr. Gardner's proposal would need to be approved by the university before he could move forward on it.  (*Id.*)  This transcript, even assuming its correctness, does not change the court's conclusion.  Nothing in Dr. Olsen's message suggests that Mr. Gardner is an employee or applicant.  Instead, it simply confirms that Mr. Gardner would not even be able to collaborate with Dr. Olsen or use MSU Extension resources until he satisfied specific requirements.  Mr. Gardner emphasizes the statement that Dr. Olsen was "challenged" when he spoke about collaborating with Mr. Gardner, but this appears only to refer to the fact that Dr. Olsen was not following MSU policy, and it says nothing about the issue at hand: whether Mr. Gardner was an employee or applicant at the time.

Mr. Gardner continues to push on this argument, arguing that he met Dr. Olsen's requirements "but was still denied employment."  Specifically, he presents evidence that Dr. Keith

Groty received IRB approval for a (presumably related) research project (one of MSU's requirements).  In a related email, Dr. Groty states, "I am working with Mary Bedikian of the MSU College of Law, Don Power[,] and with Robert Gardner[,] a former student[,] to conduct research on the viability of a farm labor mediation service in Michigan."  (Pl.'s Ex. 8c, ECF No. 52-8, at 4.)  The phrase "working with" does not show that Mr. Gardner was an employee or applicant, however, and without that, Dr. Groty's IRB approval is irrelevant.

Moving on from his interactions with Dr. Olsen, Mr. Gardner claims several other instances where Defendants interfered with his employment.  None of these examples are borne out by the evidence, however.

First, Mr. Gardner points to his attempts in 2007 and 2008 to work with Dr. Michelle Kaminski on a research project.  (*See* Pl.'s Ex. 4, ECF No. 52-4.)  According to emails from this time, Dr. Kaminski showed "initial interest" in the proposed project (*id.* at 2), and they received IRB approval (*id.* at 6), before Steve Lovejoy declined Mr. Gardner's "request for MSUE staff assistance in carrying out [his] research project":

> I have talked to Professor Kaminski who informed me that she was under the impression that you were an active graduate student at MSU in the Dept. of Agricultural Economics.  In checking with the Department of Agricultural Economics, that is not correct.  In fact, we are unaware of any present connection to MSU.  Therefore, she has decided to close out her IRB request.  Without an IRB approval, your project does not meet the requirements of our policy concerning MSUE staff assistance.

(*Id.* at 8.)  Like Dr. Olsen's emails above, this email makes clear that Mr. Gardner was not considered an employee or applicant, but rather a third party who was attempting to get MSU staff to assist with his project.  Nor does the fact that Mr. Gardner proposed to pay himself out of grant funds (*id.* at 5) make him an employee or applicant.  Payment alone does not create an employment

14

relationship; the courts must instead look at the manner of payment, in light of other circumstances, to answer this question.  Those circumstances simply do not suggest an employment relationship here, either existing or desired.  Mr. Gardner's claims on this point therefore fail.

Next, Mr. Gardner discusses an alleged employment opportunity involving Dr. Groty and Mary Bedikian, the law professor, in 2009.  He presents a series of emails between himself and these individuals, but nothing actually suggests that Mr. Gardner sought employment or was hired.  In the first email, from late 2008, Dr. Groty references a "mediation project" in which Mr. Gardner, "Don [Power] and Mary [Bedikian] were involved."  (Pl.'s Ex. 5, ECF No. 52-5, at 5.)  The next spring, Mr. Gardner tells Ms. Bedikian that they "[n]ow have the official MSU blessing to conduct the Mediation research," and she responds to thank him for his "continued commitment to this project." (*Id.* at 2.)  In the final emails on this topic, Mr. Gardner asks about potential dates for an apparently related symposium (*id.*) and tries to organize meetings and speakers for it, though with little success (*id.* at 3–5).  As with Mr. Gardner's prior claims, none of this evidence suggests an employment relationship.  Contrary to Mr. Gardner's suggestions, his mere involvement in projects with MSU professors does not trigger Title VII's protections.

Mr. Gardner also argues that he was hired by Dr. Eduardo Guizar, a Professor of Spanish at MSU.  His supporting evidence again consists of an IRB approval, along with a grant that Mr. Gardner proposes to split between himself and Dr. Guizar.  (*See* Pl.'s Ex. 6, ECF No. 52-6.)  This grant, however, was only $500 and only intended to cover two meetings; the documentation here suggests no ongoing compensation.  These facts do not suggest an employment relationship, and nothing else in the proffered evidence supports Mr. Gardner's characterization of his relationship with Dr. Guizar.  This claim therefore fails for the reasons discussed above.

15

Mr. Gardner's response also refers to an incident involving Ruben Martinez, but he fails to point to any evidence regarding this incident, and so it will not prevent summary judgment here.

Finally, though Mr. Gardner does not specifically cite it in the relevant section of his argument, he submitted a signed affidavit with his response that states, "I . . . was associated with Michigan State University in a variety of matters both officially and unofficially. . . . I have had employment type relationships with the people mentioned and had these relationships terminated. . . ." (Pl.'s Ex. 12, ECF No. 52-12.) This bare statement is not enough to stave off summary judgment. It is too vague to create a genuine issue of disputed fact. Even if the court accepts that Mr. Gardner has had "employment type relationships" with certain people at MSU, this does not include enough detail for the court to accept that these relationships were in fact employment and that they were in fact the relationships that Mr. Gardner claims Defendants retaliated against him regarding.

In sum, even if the evidence on record is read in the light most favorable to Mr. Gardner, the court cannot say that there is a genuine dispute of material fact regarding whether Defendants took action against him as an employee or an applicant for employment. He therefore cannot establish a *prima facie* case of retaliation, and the court will grant Defendants' motion for summary judgment on counts I and II.

### B.     Plaintiff's Section-1985 Conspiracy Claim

#### 1.     *Motion to Dismiss*

Next, Defendants argue that Mr. Gardner has failed to state a claim of conspiracy to interfere with civil rights under 42 U.S.C. § 1985. To prevail on this claim, Mr. Gardner must allege a conspiracy. *Coker v. Summit Cnty. Sheriff's Dep't*, 90 F. App'x 782, 789 (6th Cir. 2003). He has

not done so, Defendants assert.

Mr. Gardner's Count IV is particularly poorly drafted.  The heading of this count states that it is brought against "all defendants," though this court has already held that such a claim cannot be brought against Defendant MSU.  The associated allegations only partially fix this problem, asserting nonsensically that "Defendant Simon . . . wrongfully conspired with one another" before asking the court to enter judgment "against Defendant MSU."  Even when read indulgently, these statements are difficult to reconcile.  But even if the court were to ignore these difficulties and read the claim as brought against Defendant Simon only, the pleading fails.  To plead a section-1985 claim, "[a] plaintiff must make sufficient factual allegations to link two alleged conspirators in the conspiracy and to establish the requisite 'meeting of the minds' essential to the existence of the conspiracy."  *Id*.  Conclusory allegations are insufficient; for this claim to go forward, Mr. Gardner must actually link Defendant Simon to another party who agreed with her to deprive him of his civil rights.  *See Amadasu v. The Christ Hosp.*, 514 F.3d 504, 507 (6th Cir. 2008).

He does not do so.  According to the text of the second amended complaint, Defendant Simon has no role in the events at issue in this suit.  Mr. Gardner does not allege that she took any direct action against him.  He does not allege that she directed others to take action against him.  Her name simply does not come up, aside from occasional insinuating mentions of her as having some relationship with people directly involved with the suit.  (*See, e.g.*, ECF No. 31, p.8, ¶¶ (d)(i)–(ii) (discussing the actions of "Lou Anna Simon's past assistant, Karen Klomparens" and "Lou Anna Simon's General Counsel, Mike Kelly").)  This does not plead a meeting of the minds.  Mr. Gardner's conspiracy claim therefore fails.

In his response, Mr. Gardner argues that he has given "several examples of University

officials working with outside agencies to deprive Plaintiff of his right to employment." This does not save his claim. For one, his claim here is not against these university officials, but against Lou Anna Simon. For another, even to the extent these officials' actions can satisfy this claim, Mr. Gardner has still failed to claim the agreement necessary for a conspiracy. Under the "intracorporate conspiracy" doctrine, members of a collective entity cannot conspire among themselves, *Amadasu*, 514 F.3d at 507, and Mr. Gardner does not allege that any external party actually agreed with these officials to work to deprive Mr. Gardner of his civil rights.

When Mr. Gardner does attempt to show Ms. Simon's involvement, his own lack of evidence becomes clear. In 2001, he was fired from his job at a community college; "[a]ssumedly, [Simon] was involved." (ECF No. 52, at 7.) In 2008, MSU's General Counsel discouraged Dr. Groty from working with Mr. Gardner; "[o]bviously, [Simon] and her subordinates were still monitoring Plaintiff's efforts." (*Id.*) In 2010, Simon "would have definitely been notified" of a Michigan State Senator's attempts to mediate the parties' dispute. (*Id.* at 8.) And in general, Simon "is the only person in this position with motivation" to harm Mr. Gardner in this way. (*Id.*) The lack of proof in these statements is evident. In a separate part of his response, Mr. Gardner suggests that Plaintiff is using this motion to avoid discovery. But the court has not prevented discovery from going forward, and Mr. Gardner has had over ten months since that time to conduct discovery. He has submitted no additional evidence, and the court sees no need to further delay its ruling on this motion.

The court will therefore dismiss Mr. Gardner's section-1985 claim.

18

2. *Motion for Summary Judgment*

Because the court is granting Defendants' motion to dismiss on this claim, it need not address Defendants' arguments on summary judgment.

**C.    Tortious Interference with Contract**

1. *Motion to Dismiss*

Next, Defendants argue that Mr. Gardner has failed to adequately plead his claim of tortious interference with contract, which under Michigan law has three elements: "(1) a contract, (2) a breach, and (3) an unjustified instigation of the breach by the defendant." *Mahrle v. Danke*, 549 N.W.2d 56, 60 (Mich. Ct. App. 1996).  They claim first that Mr. Gardner has not alleged any contract that the defendants could have tortiously interfered with; second that both defendants are immune from tort liability; and third that even if Defendant Simon were sued in her individual capacity, she is immune because Mr. Gardner has not alleged "gross negligence," which is required under Michigan law.

Mr. Gardner responds only to the first argument, claiming that the contracts at issue here were oral.  As discussed in Part A.1 above, Mr. Gardner's complaint alleges that Dr. Olsen actually hired him.  (ECF No. 31, at 8 ¶ (e).)  Though Mr. Gardner does not plead the terms of this contract, such detail is not required under the Federal Rules' liberal, notice-pleading standard.  *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002).  This is more than "a formulaic recitation of the elements of [this] cause of action," and so Mr. Gardner's pleading is sufficient on this point. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

The issue of immunity is a more difficult question.  Michigan law grants immunity from tort liability to any "governmental agency" that is "engaged in the exercise or discharge of a

governmental function." Mich. Comp. Laws § 691.1407(1). Officers, employees, and board members of governmental agencies get immunity in similar situations, so long as they were acting within the scope of their authority and did not commit gross negligence. *Id.* § 691.1407(2). This statute, however, "does not alter the law of intentional torts as it existed before July 7, 1986." *Id.* § 691.1407(3). This provision thus preserves the rules of immunity for intentional torts set out in *Ross v. Consumers Power Co.*, 363 N.W.2d 641 (Mich. 1984). *See Odom v. Wayne Cnty.*, 760 N.W.2d 217, 221 (Mich. 2008). Under *Ross*, governmental actors are entitled to immunity if they satisfy the following requirements:

> (a) The acts were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority,
>
> (b) the acts were undertaken in good faith, or were not undertaken with malice, and
>
> (c) the acts were discretionary, as opposed to ministerial.

*Id.* at 228.

Regardless of the standard that applies, the Michigan Supreme Court has held that this immunity "is a characteristic of government. . . . As such, plaintiff must plead her case in avoidance of immunity." *Mack v. City of Detroit*, 649 N.W.2d 47, 54 (Mich. 2002). Immunity is not an affirmative defense, waived if not raised in the defendant's answer. To plead a tort claim against a governmental entity, a plaintiff must allege facts that, if true, would abrogate that immunity. "[I]t is the responsibility of the party seeking to impose liability on a governmental agency to demonstrate that its case falls within one of the exceptions." *Id.* at 56.

Tortious interference with contract is an intentional tort. *Formall, Inc. v. Comty. Nat'l Bank of Pontiac*, 421 N.W.2d 289, 292 (Mich. Ct. App. 1988). It therefore falls under the *Ross*

framework.

Mr. Gardner's complaint makes no mention of governmental immunity.  But if read liberally, as they must be, his factual allegations would abrogate Defendants' immunity.  Mr. Gardner complains about various actions MSU officials and agents have taken to prevent him from maintaining employment either within or outside of MSU.  His complaint is premised on the claim that MSU had a motive to do this: retaliation for his prior legal actions.  If Mr. Gardner's tortious-interference claim is read to incorporate this motive, he has arguably negated the "good faith" requirement for immunity.  His claim therefore survives Defendants' motion to dismiss.

2.      <em>Motion for Summary Judgment</em>

Defendants' summary-judgment argument argues that Mr. Gardner cannot show any contract that Defendants could have been interfered with.  As the court discusses in Part A.2, above, the evidence on record does not support, and indeed contradicts, Mr. Gardner's claim that Dr. Olsen actually hired him.  Nor has Mr. Gardner presented evidence of any other contract that Defendants could possibly have interfered with.  For those reasons, Mr. Gardner cannot satisfy the elements of this claim.  The court will grant Defendants' summary-judgment motion on this count.

**D.      Retaliatory Harassment**

Finally, Defendants argue that "Retaliatory Harassment," Mr. Gardner's Count VI, is not a cause of action that is recognized under Michigan law.  Mr. Gardner cites no law to the contrary, and the court has found none.  To the extent this count states a cause of action, it is merely duplicative of Mr. Gardner's Title-VII and Elliott–Larsen claims.  As in those claims, Mr. Gardner argues that Defendants "alienated [him] from employment and education prospects [and] created a hostile environment" in retaliation for his prior protected conduct.  The count incorporates by

21

reference all of Mr. Gardner's prior allegations, and its scope appears no different than that of his other retaliation claims. This count therefore does not state a separate claim, and the court will dismiss it accordingly.

### 2. *Motion for Summary Judgment*

Because the court is granting Defendants' motion to dismiss on this claim, it need not address Defendants' arguments on summary judgment.

## IV. CONCLUSION

For the reasons discussed above, the court will dismiss each of Mr. Gardner's remaining claims in this matter.

22

## **ORDER**

For the reasons provided in the accompanying opinion, Defendants' motion to dismiss (ECF No. 35) is **GRANTED IN PART AND DENIED IN PART**:

    1.       Count IV (42 U.S.C. § 1985) is **DISMISSED** with prejudice;

    2.       Count VI (retaliatory harassment) is **DISMISSED** with prejudice;

    3.       Otherwise, Defendants' Motion to Dismiss is **DENIED**;

and Defendants' motion for summary judgment (ECF No. 38) is **GRANTED IN PART**:

    1.       Counts I (Title VII) and II (Elliott Larsen Civil Rights Act) are **DISMISSED**; and

    2.       Count V (tortious interference with contract) is **DISMISSED**.

    **IT IS SO ORDERED.**

Date:   March 15, 2013                    /s/ Paul L. Maloney          
                                                        Paul L. Maloney
                                                        Chief United States District Judge